# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| MODERN POINT, LLC, | Case No. 19-CV-668 (NEB/HB) |
| Plaintiff/Counter-Defendant, | |
| v. | ORDER ON MOTION FOR PRELIMINARY INJUNCTION |
| ACU DEVELOPMENT, LLC, | |
| Defendant/Counter-Claimant. | |

Modern Point, LLC ("Modern Point") moves for a preliminary injunction restraining ACU Development, LLC ("ACU") and its franchisees from using the mark and name MODERN ACUPUNCTURE in commerce in Minnesota and Colorado under state and federal trademark infringement and unfair competition law. (ECF No. 43.) For the reasons that follow, the Court grants the preliminary injunction.

## BACKGROUND

### I.       Modern Point and Lindsay Long

Modern Point has been offering acupuncture services under the name "Modern Point Acupuncture" in Minnesota and Colorado since at least 2013. (ECF No. 47 ("Long Decl.") ¶ 2.) Lindsay Long is its founder, owner, and operator. (*Id.* ¶ 1.) In 2008, Long opened a clinic in Minnesota called "Long Acupuncture Studios"; in 2012, she changed

the name to "Modern Point Acupuncture."[1] (*Id.* ¶ 13.) In 2013, Long also took over a clinic in Colorado called "Boulder Acupuncture Sports Medicine," which she combined with Modern Point Acupuncture. (*Id.* ¶ 14; ECF No. 80 ("2d Long Decl.") ¶ 13; *see* ECF No. 70 ("St. Clair Decl.") ¶ 8 ("Boulder Acupuncture Sports Medicine / Modern Point Acupuncture").) In Colorado, Modern Point has offered acupuncture services in rented space in the Mandala Integrative Medicine Clinic and in the CrossFit Sanitas gym. (2d Long Decl. ¶¶ 14–15.) Between the two states, Modern Point has performed services for thousands of clients. (*Id.* ¶ 2.)

The advertising, marketing, and public face of Modern Point demonstrate that Modern Point has held itself out as "Modern Point Acupuncture" in marketing media, including magazines, radio, mailers, and social media such as Facebook, Yelp, and Twitter, as well as patient invoices, receipts, correspondence, and clinic location signage. (Long Decl. ¶¶ 18–19; 2d Long Decl. ¶¶ 4–9.) Modern Point regularly sends Modern Point Acupuncture email newsletters to its patient lists, which when combined exceed 5,000 clients. (2d Long Decl. ¶ 7.)

In January 2019, Long filed registrations for the name "Modern Point Acupuncture" in Minnesota and Colorado. (Long Decl. ¶¶ 31–32, Exs. B, C.) In addition,

---

[1] ACU questions whether Modern Point began operating exclusively as "Modern Point Acupuncture" in Minnesota in 2012 or 2013. The quibble is immaterial, because the evidence shows that Modern Point was operating as Modern Point Acupuncture in both Minnesota and Colorado by at least the end of 2013, several years before ACU entered those markets.

Modern Point has owned the website www.modernpointacupuncture.com since July 2012. (Long Decl. ¶ 18.) The website shows the Modern Point logo mark and graphic as stating "Modern Point acupuncture & sports medicine." (St. Clair Decl. ¶ 14.)

## II.     ACU

ACU appears to have entered the acupuncture business in approximately 2017. (*See* St. Clair Decl. ¶ 10.) It is a franchise model, providing recurring memberships for acupuncture clients. (*Id.*) It operates under the name "Modern Acupuncture," and has fifty franchise locations in more than thirty states. (*Id.*) ACU owns several federally-registered trademarks for the MODERN ACUPUNCTURE family of marks and related branding, which it licenses to franchisees. (*Id.*) ACU received its first federal registration in May 2017. (*Id.*; St. Clair Decl., Ex. E.) ACU has six franchisees in Minnesota and Colorado that are independently owned and operated companies; they are connected to ACU through Franchise Agreements. (St. Clair Decl. ¶ 11.) The franchisees operate three Modern Acupuncture clinics in Colorado and one in Minnesota. Modern Acupuncture Locations, https://www.modernacupuncture.com/locations (last visited Oct. 26, 2020).[2] The three Colorado clinics opened in 2018 and 2019; the Minnesota clinic opened in February 2019. (Long Decl. ¶¶ 4, 5, 21, 22.) ACU Director of Marketing Lindsay St. Clair attests that the franchisees in Colorado and Minnesota have each invested approximately $2 million developing their businesses. (St. Clair Decl. ¶ 13.)

---

[2] ACU does not explain the ownership structure of the four clinics by the six franchisees.

### III.    Confusion

Soon after the Modern Acupuncture clinics opened in Colorado and Minnesota, Modern Point began receiving inquiries from new and old clients confusing the two names. (Long Decl. ¶¶ 6, 28; *see* 2d Long Decl. ¶ 10, Exs. C–E; ECF No. 119 ("Long Dep.") at 37–41.) Similarly, other acupuncturists have indicated confusion between Modern Point Acupuncture and Modern Acupuncture on social media and have asked about Long's connection to Modern Acupuncture. (*See, e.g.,* Long Decl. ¶¶ 24 (noting the confusion), 25 ("I even had a moment where I confused the two! And certainly don't want my referrals to get confused either."), 34 ("I know this has been 'horrible' for [Long] both in MN and in CO . . . . It 100% sucks for her."), 43 ("I think you might be confusing . . . Modern Point Acupuncture in Maple Grove with the new franchise Modern Acupuncture that recently opened in Minnetonka. [Long] isn't associated with the 'Let's Tingle' catch phrase franchise model.").) Long attests that Alyssa Johnson—who is affiliated with an ACU franchise in Minnesota—admitted the Modern Acupuncture was a "corporate name" that would bring Modern Point "a lot of confusion," and that if Johnson could have changed the name of Modern Acupuncture, she would have. (Long Decl. ¶¶ 33–34; *see* Modern Acupuncture, Westwind Plaza Minnetonka (Will Permanently Close 10/24/2020), https://www.modernacupuncture.com/minnesota/minnetonka/westwind-plaza-minnetonka-mn001 (last visited Oct. 26, 2020) (identifying

Johnson as the sole acupuncturist at the Modern Acupuncture clinic in Minnesota).)

Acupuncture marketers have also confused the two companies. (*E.g.*, Long Decl. ¶ 30.)

Long attests that she and her employees have "wasted over 100 hours of time responding to instances of consumer confusion over the phone, via email, on social media, and through in-person discussions." (Long Decl. ¶ 29; *see* Long Dep. at 38, 43–44.) ACU admitted that the marks are confusingly similar in its original Answer. (ECF No. 7 ("Ans.") ¶¶ 6, 26, 46.)[3] Long attests that this confusion has harmed and will continue to harm Modern Point's reputation because Modern Acupuncture has a "general negative reputation" in the industry. (Long Decl. ¶¶ 39–43.) In addition, Long claims to have experienced difficulty hiring talent because of Modern Acupuncture's negative reputation. (*Id*. ¶ 44.)

Due to this confusion, in early 2019, Long repeatedly asked ACU to change the name of its Colorado and Minnesota clinics. (Long Decl. ¶ 7; *see also* ECF No. 1 ("Compl.") ¶ 44 (referencing letter to ACU in January 2019 demanding that it cease and desist from using the MODERN ACUPUNCTURE mark and MA logo); Ans. ¶ 44 (admitting to receiving a cease-and-desist letter on or about January 4, 2019).) In response, ACU's principals told her "they have big plans for Modern Acupuncture and will not change their branding for anyone." (Long Decl. ¶ 8.)

---

[3] ACU has since withdrawn those admissions after being granted leave to amend its Answer. (ECF No. 115.)

IV.    **Long's Bouts with Cancer**

In March 2018, Long was diagnosed with cancer. (2d Long Decl. ¶ 16.) She had her first surgery in July 2018. (*Id*.) Long was undergoing cancer treatment when she learned of the opening of the Modern Acupuncture clinics in Colorado in 2018. (*Id*.) The cancer and its treatment limited Long's ability to address the problem created by the Modern Acupuncture name. (*Id*. ¶ 17.) But in early 2019, when ACU and its franchisees opened a new clinic in Minnesota, Long had sufficiently recovered from her cancer treatment to file this action, and she did so. (*Id*. ¶ 18.)

Just a few months later, Long learned that her cancer had recurred. (Long Decl. ¶ 10; 2d Long Decl. ¶ 19; Long Dep. at 62.) She had additional surgeries in August and November 2019, as well as other procedures. (2d Long Decl. ¶ 19.) Long underwent seven rounds of chemotherapy in the months leading up to March 2020, during which she was in extreme pain. (*Id*.)

V.    **Impact of the COVID-19 Pandemic**

COVID-19 is a highly infectious respiratory disease that has caused a global pandemic.[4] Due to COVID-19 health concerns, the states of Minnesota and Colorado

---

[4] As of October 26, 2020, COVID-19 has killed over 224,000 Americans, including over 2,300 Minnesotans and over 2,000 Coloradans. *See* Ctrs. for Disease Control and Prevention, CDC , Coronavirus (COVID Data Tracker,-19), https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last accessed Oct. 26, 2020); Minn. Dep't of Health, Situation Update for COVID-19, https://www.health.state.mn.us/diseases/coronavirus/situation.html (last accessed Oct. 26, 2020); Colo. Dep't of Public Health &

6

placed restrictions that reduced acupuncture services in the spring of 2020. *See generally* Stay Safe MN, State of Minn., https://mn.gov/covid19/for-minnesotans/stay-safe-mn/stay-safe-mn.jsp (last visited Oct. 23, 2020); Safer at Home, Colo. Dep't of Pub. Health & Envir., https://covid19.colorado.gov/safer-at-home (last visited Oct. 23, 2020). As a result, Modern Point largely closed its clinics until May 2020, when it transitioned to limited hours for essential patient care. (Long Decl. ¶ 36; *see id.* ¶ 37 ("[T]he current use and demand for acupuncture services is much lower than pre-pandemic time frames."); *see* Long Dep. at 115 (testifying that COVID-19 continues to impact Modern Point's business).) ACU's clinics were also negatively affected by the mandatory closures and economic devastation caused by COVID-19. (ECF No. 104 ("2d St. Clair Decl.") ¶ 2.) Due to the pandemic, ACU's franchisees in Colorado and Minnesota are losing money while they operate, and ACU clinics in other states have closed permanently. (*Id.*)

## VI.    Procedural History

As referenced above, Modern Point filed its complaint in this district on March 13, 2019. (Compl.) The Complaint alleges several counts against ACU, including: unfair competition in violation of Lanham Act § 43(a), 15 U.S.C. § 1125(a); trademark infringement and unfair competition under Minnesota common law; trademark infringement under Colorado common law; deceptive trade practices in violation of

---

Envir., Colorado COVID-19 Data, https://covid19.colorado.gov/data (last accessed Oct. 26, 2020).

Minn. Stat. § 325D.44; and declaratory judgment to cancel certain federally-registered MODERN ACUPUNCTURE marks. (*Id.* ¶¶ 48–135.)

One month after this lawsuit, ACU filed a similar lawsuit against Modern Point in the District of Colorado. *ACU Dev., LLC v. Modern Point, LLC*, No. 1:19-CV-1063-MEH (D. Colo.). In July, ACU then filed its answer, affirmative defenses, and counterclaim in this case. On September 23, the Court entered the parties' stipulation to a stay of the proceedings in light of Long's cancer treatments. (ECF Nos. 15, 17.) One week later, the District of Colorado granted Modern Point's motion to dismiss based on the first-filed doctrine, and the Colorado case was transferred to this district. *ACU Dev., LLC v. Modern Point, LLC*, No. 19-CV-2619, ECF No. 26 (D. Minn. Sept. 30, 2019). In March 2020, the Court granted the motion to consolidate this case with the case transferred from Colorado. (ECF No. 28.)

The Court lifted the stay of this case on April 13, 2020. (ECF No. 30.) On May 29, the parties stipulated to another stay while they engaged in settlement discussions. (ECF No. 40.) Those discussions were unsuccessful. On June 1, the Court granted the parties' stipulation for stay and request to extend certain pretrial deadlines in light of COVID-19-based health and business concerns. (ECF No. 42.) That stay was lifted on June 22. (Long Decl. ¶¶ 11, 12.) Four days later, on June 26, Modern Point filed its motion for preliminary injunction. (ECF No. 43.) In August, in a motion before United States Magistrate Judge Hildy Bowbeer, ACU sought to amend its answer, affirmative defenses, and

counterclaims. (ECF No. 82.) The motion was granted in part and denied in part on October 22, 2020. (ECF No. 115.)

Before the hearing on the preliminary injunction motion, ACU asked that the hearing be continued to a later date in light of Long's upcoming deposition. ACU also requested supplemental briefing to address any new relevant evidence garnered from that deposition. This Court granted ACU's requests. (ECF No. 81.) ACU deposed Long, and both parties filed supplemental briefs and supporting exhibits prior to the hearing. (ECF Nos. 102–12.) Because of the extensive briefing and evidence submitted to the Court, including the complete transcript of Long's deposition, the parties chose not to proffer any additional evidence at the hearing. The Court held a hearing on the motion on October 9. (ECF No. 113.)

On October 19, the Court held a status call with the parties at which ACU presented new information about its franchisees' recent efforts to expand to other locations in Colorado. (ECF No. 114.) During the call, Modern Point informed the Court that it appeared ACU's sole location in Minnesota would soon be permanently closed. *See* Modern Acupuncture, Westwind Plaza Minnetonka (Will Permanently Close 10/24/2020), https://www.modernacupuncture.com/minnesota/minnetonka/westwind-plaza-minnetonka-mn001 (last accessed Oct. 26, 2020) (indicating the Minnesota location "will be permanently closed on 10/24/2020").

## ANALYSIS

### I.     Preliminary Injunction Standard

Modern Point seeks, essentially, a preliminary injunction to restrain ACU from using the MODERN ACUPUNCTURE mark in Minnesota or Colorado commerce. (ECF No. 48 (Proposed Order).) The Court must consider four familiar factors in deciding whether to grant a preliminary injunction: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant if the injunction is not granted; (3) the balance between this harm and the injury that granting the injunction will inflict on the other parties; and (4) the public's interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase,* 640 F.2d at 113. As the party seeking injunctive relief, Modern Point bears the burden of proving these factors. *Lankford v. Sherman*, 451 F.3d 496, 503 (8th Cir. 2006).

### II.     Likelihood of Success on the Merits

The Court begins with the most important of the *Dataphase* factors: the likelihood of success on the merits. *Jet Midwest Int'l Co. v. Jet Midwest Grp., LLC*, 953 F.3d 1041, 1044 (8th Cir. 2020) (citation omitted). Modern Point does not need to prove a greater than fifty percent likelihood that it will prevail on the merits. *Dataphase Sys*., 640 F.2d at 113. Rather, it "must simply show a 'fair chance of prevailing.'" *Jet Midwest Int'l*, 953 F.3d at 1045

(quoting *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc)).

Modern Point alleges trademark infringement and unfair competition under the Lanham Act and state common law. To prevail on trademark infringement claims, the trademark owner must "prove that it has ownership or rights in the trademark and that the defendant has used the mark in connection with goods or services in a manner likely to cause consumer confusion as to the source or sponsorship of the goods or services." *Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 634 F.3d 1005, 1009 (8th Cir. 2011) (addressing Lanham Act and common law trademark infringement claims); *see Northland Ins. Cos. v. Blaylock,* 115 F. Supp. 2d 1108, 1117 (D. Minn. 2000) ("[T]o prevail on its common law trademark infringement claim, plaintiff must show that: (1) it has a protectable mark; (2) it has priority of use of that mark[;] and (3) defendant's subsequent use of that mark is likely to cause confusion." (citing *Gen. Mills, Inc. v. Kellogg Co*., 824. F.2d 622, 626 (8th Cir. 1987)). "[E]xclusive right to use a mark belongs to the first who appropriates it and uses it in connection with a particular business." *Sweetarts v. Sunline, Inc*., 380 F.2d 923, 926 (8th Cir. 1967).

Based on the evidence before the Court, Modern Point has a fair chance of proving these elements—that is, that Modern Point has priority use of a valid, protectable mark, and that ACU's use of the mark is likely to cause consumer confusion.

### A. *Priority Use of a Valid, Protectable Mark*

Modern Point argues that it has priority use of the MODERN POINT ACUPUNCTURE name and mark in Minnesota and Colorado. The record evidence supports that conclusion, demonstrating that Modern Point had been using its mark for several years before ACU registered its first mark (in May 2017) and then opened its clinics in Colorado and Minnesota (in 2018 and 2019). ACU contends that Modern Point's use of the mark was not exclusive because Long's former business partner was doing business as "Modern Point Acupuncture, LLC" in Minnesota until July 2013. (ECF No. 69 at 32); *First Bank v. First Bank Sys., Inc.*, 84 F.3d 1040, 1045 (8th Cir. 1996) ("A trademark user establishes secondary meaning by showing that through long and exclusive use in the sale of the user's goods, the mark has become so associated in the public mind with such goods that the mark serves to identify the source of the goods and to distinguish them from those of others." (quotation marks and citation omitted)). The fact that Modern Point did not initially use the name "Modern Point Acupuncture" exclusively does not affect its right to use the name once it became the exclusive user in 2013. *See generally* 2 McCarthy on Trademarks and Unfair Competition § 15:27 (5th ed.) ("[T]he issue is not whether plaintiff's use was exclusive, but whether plaintiff's use of the mark had achieved secondary meaning, as opposed to anyone else's use of a similar mark."). Indeed, ACU

admitted that Modern Point had rights superior to ACU's MODERN ACUPUNCTURE

mark in its original Answer to the Complaint. (Ans. ¶ 46.)[5]

Aside from priority of use, ACU attacks the MODERN POINT ACUPUNCTURE

mark as not protectable because it is merely descriptive. "A term for which trademark

protection is claimed will fall in one of four categories: (1) generic, (2) descriptive,

(3) suggestive, or (4) arbitrary or fanciful." *Frosty Treats Inc. v. Sony Comput. Entm't Am.

Inc.*, 426 F.3d 1001, 1004 (8th Cir. 2005) (citation omitted). A term is descriptive if it

conveys "an immediate idea of the ingredients, qualities or characteristics of the goods,"

and "is protectible only if shown to have acquired a secondary meaning." *Id*. at 1005

(quotation marks and citation omitted). While ACU maintains that the words "modern,"

"point," and "acupuncture" are merely descriptive, "the commercial impression of a

trade-mark is derived from it as a whole, not from its elements separated and considered

in detail." *Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc.*, 908 F.3d 313, 337

(8th Cir. 2018) (citation omitted). The Court "must evaluate the impression that each mark

in its entirety is likely to have on a purchaser." *Id*. (citation omitted). Based on the

evidence currently before it, the Court concludes that Modern Point has a fair chance of

prevailing on its claim that "Modern Point Acupuncture" is not merely descriptive, *i.e.*,

---

[5] While Judge Bowbeer's recent order allows ACU to withdraw this admission, the original admission remains evidence in the case. (ECF No. 115); *Sunkyong Int'l, Inc. v. Anderson Land & Livestock Co.*, 828 F.2d 1245, 1249 n.3 (8th Cir. 1987) (citations omitted) ("A pleading abandoned or superseded through amendment no longer serves any function in the case, but may be introduced into evidence as the admission of a party.").

that it does not merely convey "an immediate idea of the ingredients, qualities or characteristics" of the services offered by Modern Point. *Frosty Treats*, 426 F.3d at 1005 (citation omitted).

ACU also argues that Modern Point's mark has not acquired secondary meaning, that is, "an association formed in the minds of consumers between the mark and the source or origin of the product." *Id*. (citation omitted). Secondary meaning requires that "the public recognize the mark and associate it with a single source." *Id.* ACU contends that Modern Point has not shown that its mark was associated with its services in the minds of consumers given its minimal advertising, and asserts that Modern Point should have provided the Court with direct evidence such as consumer surveys. *See First Bank*, 84 F.3d at 1045 (finding plaintiff "FB's evidence of secondary meaning consisted almost exclusively of efforts undertaken by the bank to identify itself as FIRST BANK prior to 1971. Although relevant, FB's efforts are not determinative of whether consumers actually identified FIRST BANK with FB."). ACU claims that such surveys would likely be unhelpful because Google search results indicate that the acupuncture markets near Modern Point's locations are crowded. (ECF No. 69 at 30 (citing St. Clair Decl. ¶ 17 (attesting to Google results of sixteen acupuncture providers within an hour's drive of Modern Point's Colorado locations (twelve with "point" and three with "modern" in their names), and two providers within an hour's drive of its Minnesota location with "point" in their names)).)

14

While courts consider direct evidence (*e.g.*, consumer testimony or surveys) as most probative of secondary meaning, "[c]ircumstantial evidence such as the exclusivity, length and manner of the use of the mark; the amount and manner of advertising; the amount of sales and number of customers; the plaintiff's established place in the market; and the existence of intentional copying could also establish secondary meaning." *Frosty Treats,* 426 F.3d at 1005–06. Modern Point provides circumstantial evidence of the use of the MODERN POINT ACUPUNCTURE mark in news media, mailers, radio, invoices, receipts, signage, and social media in both Colorado and Minnesota since at least 2013. (*E.g.*, Long Decl. ¶¶ 18–19; 2d Long Decl. ¶¶ 4–9; *id.* ¶ 7 (attesting to emailing Modern Point Acupuncture newsletters to patient lists exceeding 5,000 clients; *see Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1086 (7th Cir. 1988) (relying on the amount and manner of advertising and the mark owner's lengthy use to conclude that the mark owner had a "better than negligible" chance of succeeding on a showing of secondary meaning, despite the absence of survey evidence); *Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 1583 (Fed. Cir. 1988) ("[A]bsence of consumer surveys need not preclude a finding of acquired distinctiveness."). In addition to offering acupuncture services as Modern Point Acupuncture in Minnesota and Colorado since at least 2013, Modern Point has used the website www.modernpointacupuncture.com since 2012, as well as email addresses at the @modernpointacupuncture.com domain. In light of the

evidence presented by Modern Point, ACU's Google search results do not tip the balance in its favor.

ACU raises several other arguments that fail to refute Modern Point's establishment of likelihood of success. First, ACU contends that Modern Point does not have a valid mark in MODERN POINT ACUPUNCTURE because its website logo boldly displays the words "Modern Point" with "acupuncture & sports medicine" in smaller text, indicating that "Modern Point" is the name of the company. (ECF No. 69 at 26.) But Modern Point's claims are not based on its website logo, and should not be so limited given the evidence of its consistent use of "Modern Point Acupuncture," including the website address itself. (*E.g.*, Long Decl. ¶ 19.) Second, ACU argues that Modern Point's mark is not valid because it does business in Colorado as "Boulder Acupuncture Sports Medicine/Modern Point Acupuncture" through the Mandala Integrative Medicine Clinic and the CrossFit Sanitas gym. (ECF No. 69 at 27; St. Clair Decl. ¶ 8.) Long explains that this name merely reflects brands used in combination when she took over the Boulder acupuncture business, and that she rarely uses the "Boulder Acupuncture Sports Medicine" name; it is primarily for older clients with memory issues. (Long Decl. ¶ 13; Long Dep. at 104–05.)

Modern Point has presented enough evidence to demonstrate that it is likely to prevail on its claim that it has a valid, protectable mark. Moreover, the evidence before the Court indicates that Modern Point has continually used the MODERN POINT

ACUPUNCTURE mark since at least 2013. The Court therefore finds that Modern Point is likely to prevail on its argument that it has priority over ACU for the use of its mark in Minnesota and Colorado.

### B.   Likelihood of Confusion

ACU's first Answer admits that the parties' marks are confusingly similar. (Ans. ¶¶ 6, 26, 46.) As mentioned above, that admission is evidence before the Court. The Court also considers: 1) the strength of the trademark owner's mark; 2) the similarity between the trademark owner's mark and the alleged infringing mark; 3) the degree to which the allegedly infringing services competes with the trademark owner's services; 4) the alleged infringer's intent to confuse the public; 5) the degree of care reasonably expected of potential customers; and 6) evidence of actual confusion. *Cmty. of Christ Copyright Corp.*, 634 F.3d at 1009.

#### 1.   Strength of the Mark

"Generally, the strength of the mark depends on two factors—the distinctiveness of the mark and the extent to which the mark is recognized by the relevant consumer class." *J & B Wholesale Distrib., Inc. v. Redux Beverages, LLC*, 621 F. Supp. 2d 678, 684 (D. Minn. 2007) (citation omitted). Modern Point has provided examples of acupuncturists and referral sources who know Modern Point Acupuncture as a distinctive brand in Minnesota and Colorado, including an affiliate of ACU's Minnesota clinic. (*E.g.*, Long Decl. ¶¶ 25, 33–34, 43.) ACU disagrees based on its arguments above, *i.e.*, the lack of direct

17

evidence regarding the minds of consumers, and the Google search results of other acupuncture clinics using the same words in their names. Based upon the record evidence, Modern Point is likely to prevail on the argument that its mark is relatively strong.

### 2. *Similarity between the Marks*

Similarity is based on an examination of a mark as a whole. *SquirtCo. v. Seven–Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980). Closely-related products or services require "less similarity in the trademarks . . . to support a finding of infringement." *Id.* Here, the parties do not dispute that their marks are similar. (ECF No. 69 at 35.) Thus, this factor weighs in favor of Modern Point. *E.g., George & Co. v. Xavier Enters., Inc.*, No. 09-CV-2973 (DWF/RLE), 2009 WL 4730331, at *4 (D. Minn. Dec. 4, 2009) ("[T]he similarity between the marks weighs in favor of a finding of infringement.").

### 3. *Degree of Competition*

Where the parties are direct competitors, the degree of competition factor weighs in favor of the trademark owner. *Sensient Techs. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 766 (8th Cir. 2010). In the briefing, neither party disputes the competitive nature of the parties' acupuncture services. At the hearing, ACU's counsel argued for the first time that the parties do not compete for the same acupuncture clients. Because ACU presents no evidence to support this argument, the Court disregards it. Based on the evidence

before the Court, the services offered by ACU are similar to and compete with Modern Point's services.

      4. *Alleged Infringer's Intent to Confuse the Public*

Proof of an alleged infringer's intent to confuse the public is not required to prevail on a trademark infringement or unfair competition claim, but "the absence of such intent is a factor to be considered." *Sensient*, 613 F.3d at 766 (citing *Frosty Treats*, 426 F.3d at 1008). Modern Point maintains that ACU and its franchisees were actually or constructively aware of Modern Point Acupuncture when it opened its clinics in Colorado and Minnesota in 2019 because of Modern Point's state-registered trademarks. Johnson, who was affiliated with ACU's Minnesota franchise, acknowledged the confusion caused by the similar names, and stated that if she could change the franchise name, she would. (Long Decl. ¶¶ 33–34.)

ACU's awareness of Modern Point Acupuncture's existence does not amount to intent to cause customer confusion. *See Sensient*, 613 F.3d at 766 ("Knowledge of another's product and an intent to compete with that product is not equivalent to an intent by a new entrant to a market to mislead and to cause consumer confusion."). But ACU's admission in its Answer that it "continued to use the confusingly similar" MODERN ACUPUNCTURE mark after receiving "actual notice of [Modern Point's] superior rights and legitimate objections" to the mark leaves the record murky on the issue of intent. (Compl. ¶ 46; Ans. ¶ 46.)

5. *Degree of Care Expected of Customers*

In considering the degree of care expected of customers, the court "must stand in the shoes of the ordinary purchaser, buying under the normally prevalent conditions of the market" and giving the attention such a purchaser would usually give in buying the type of goods at issue. *Sensient*, 613 F.3d at 769 (citation omitted). This factor is "more important in confusion-of-source cases where the degree of care that the purchaser exercises in purchasing a product can eliminate the confusion that might otherwise exist." *Id.* (citing *Frosty Treats*, 426 F.3d at 1010). ACU claims that the likelihood of confusion is diminished because acupuncture consumers are sophisticated and purchase after a collaborative process. But this assertion is undercut by ACU's lack of supporting evidence as well as Modern Point's evidence of confused consumers. (*E.g.,* 2d Long Decl. Exs. C–E (records of calls from confused consumers).) Because Modern Point has shown that, due to the similarity of the parties' marks, at least some consumers have been confused, this factor weighs in favor of Modern Point.

6. *Evidence of Actual Confusion*

Modern Point provides evidence of actual confusion by consumers, acupuncturists, and marketers of acupuncture services. (*E.g.,* Long Decl. ¶¶ 6, 23–26, 28, 30, 34, 43.) ACU contends that the evidence indicates that consumers still associate Modern Point Acupuncture with Long, rather than Modern Acupuncture. The Court disagrees. Prior to the COVID-19 pandemic, Long and her employees received inquiries

from consumers thinking they had contacted a Modern Acupuncture clinic on a weekly basis; these inquiries still continue. (*Id.* ¶ 28; *see id.* ¶ 29 (attesting Modern Point employees have responded to instances of consumer confusion over the phone, via email, on social media, and in person); 2d Long Decl. ¶ 10, Exs. C–E (three examples of confusion); Long Dep. at 37 (describing a recent call with a confused consumer).) Other acupuncturists have also been confused. (*E.g.,* Long Decl. ¶ 24 (one acupuncturist explaining to another, "You are mistaking Modern Acupuncture with Modern Point Acupuncture which Lindsay Long owns and is a different business which is definitely a confusing distinction."); *id.* ¶ 25 (acupuncturist explaining her confusion, noting "the [Modern Acupuncture] name absolutely brought to mind [Long's] brand"); *id.* ¶ 34.) A marketer explained she thought Long "was part of [Modern Acupuncture] because as I searched for Modern Acupuncture she came up in the search . . . . I thought she was part of the bigger franchise group." (Long Decl. ¶ 30; *id.*, Ex. A.) These examples indicate actual confusion between Modern Point Acupuncture and Modern Acupuncture.[6]

Having considered these six factors, the Court finds that Modern Point has a fair chance of proving that ACU and its franchisees' use of the MODERN ACUPUNCTURE mark in Minnesota and Colorado creates a likelihood of confusion among the consuming

---

[6] The Court does agree with ACU that at this stage, Long's claims that Modern Point has difficulty hiring talent because of Modern Acupuncture's negative reputation is speculative. *See In re Travel Agency Comm'n Antitrust Litig.*, 898 F. Supp. 685, 689 (D. Minn. 1995) ("[A]n injunction cannot issue based on imagined consequences of an alleged wrong. Instead, there must be a showing of imminent irreparable injury.").

public, as well as other participants in the acupuncture market. For these reasons, Modern Point has demonstrated a likelihood of success on the merits.

### C. *Unclean Hands Defense*

In its supplemental brief, ACU argues that Long's actions implicate the unclean hands defense. "Unclean hands is an equitable defense that restricts the availability of equitable remedies to parties who are guilty of unconscionable conduct. For a successful unclean hands defense, a party's conduct must be unconscionable by reason of a bad motive or because the result brought about by the conduct would be unconscionable." *Benfield, Inc. v. Moline*, No. 04-CV-3513 (MJD/SRN), 2006 WL 452903, at *16 (D. Minn. Feb. 22, 2006) (citing *Progressive Techs., Inc. v. Shupe*, No. A04–1110, 2005 WL 832059, at *4 (Minn. Ct. App. Apr. 12, 2005)). This defense "may be invoked only against a party that has committed wrongdoing of serious proportions, indicating that it might not be sufficient that the wrongdoing was willful if it was not also substantial to an appropriate degree." *Sturgis Motorcycle Rally*, 908 F.3d at 344–45 (internal citations omitted).

ACU's argument on this topic does not warrant denial of the injunction. ACU contends that Long likely committed perjury when she filed registrations with the State of Colorado claiming that she was transacting business as "Modern Acupuncture" between 2017 and 2020. (Long Dep. Ex. 4.) Long testified that she filed the statements "to protect [her business] name now that there was a business out there with a very similar name," and that she was putting ACU on notice of her existence in "a cheap and easy"

manner. (Long Dep. at 79.) When ACU brought its objection to Modern Point's attention, Long immediately filed a correction with the Colorado secretary of state. (ECF No. 93-1 at 5–6 (Kroll Decl. in Support of Opp. to Mot. to Am. Ans., Ex. B) (Colorado statement of correction dated Aug. 19, 2020, correcting trade name from "Modern Acupuncture" to "Modern Point Acupuncture").)

ACU also argues that Long's first declaration gives the misimpression that Long filed the Minnesota Certificate of Organization for the "Modern Point Acupuncture, LLC," when in fact her former business partner filed it, and later terminated it. (*See* Long Decl. ¶ 19 (stating "Modern Point Acupuncture's legal entity originally bore its full name, but the name was changed to Modern Point, LLC for unrelated reasons.").) Long explained the history of her relationship with her former business partner who filed this Certificate of Organization, in her second declaration and deposition. (2d Long Decl. ¶¶ 11–12; Long Dep. at 23–27.) The Court has considered these and other assertions by ACU of Long's allegedly unclean hands, and finds that they are not of serious proportion to ACU's alleged trademark infringement. As such, they do not alter the Court's determination of Modern Point's likelihood of success on the merits.

### III.     Threat of Irreparable Harm

The evidence indicates that confusion is irreparably harming Modern Point's business reputation, goodwill, and customer and professional relationships.[7] "Loss of intangible assets such as reputation and goodwill can constitute irreparable injury." *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003) (quoting *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002)). "Harm to reputation and goodwill is difficult, if not impossible, to quantify in terms of dollars." *Id.*; *see, e.g.*, *Roederer v. J. Garcia Carrión, S.A.*, 732 F. Supp. 2d 836, 881 (D. Minn. 2010) ("Monetary damages are inadequate to compensate [plaintiff] for the harm to its goodwill and reputation.").

For example, Modern Point offers evidence of other acupuncturists' statements on Facebook stating Modern Acupuncture will tarnish Modern Point's reputation. (*E.g.*, Long Decl. ¶ 43 ("Long has a very reputable and established clinic . . . . I do not want this new cheap establishment to tarnish the good name of the business she has worked so

---

[7] Modern Point maintains that it is entitled to a presumption of irreparable harm. *See Gen. Mills*, 824 F.2d at 625 ("Since a trademark represents intangible assets such as reputation and goodwill, a showing of irreparable injury can be satisfied if it appears that [movant] can demonstrate a likelihood of consumer confusion."). As the parties acknowledge, the Eighth Circuit has questioned whether the presumption of irreparable harm in trademark cases has survived more recent Supreme Court opinions emphasizing the movant's burden to show that "irreparable injury is likely in the absence of an injunction." *Phyllis Schlafly Revocable Tr. v. Cori*, 924 F.3d 1004, 1009 (8th Cir. 2019) (citing *Winter*, 555 U.S. at 22). The Court need not resolve this issue because the record includes evidence of actual confusion and harm.

24

hard to build since their name is so similar.").) Long testified that Modern Point cannot separate itself from ACU's franchise, and she does not want Modern Point Acupuncture to be associated with Modern Acupuncture's "fufu" reputation and tagline, "Let's Tingle." (Long Dep. at 55–57; *see* Long Decl. ¶ 41 ("ACU's reputation for a spa-like experience affects Modern Point Acupuncture's ability to maintain its positive reputation in sports medicine and women's health.").) The Court concludes that Modern Point has demonstrated that it has suffered, and will continue to suffer, irreparable harm as a result of ACU and its franchisees' use of the name MODERN ACUPUNCTURE in commerce in Minnesota and Colorado.

The real stumbling block to Modern Point—and to the Court's analysis—is the time that elapsed between Modern Point's discovery of ACU's clinics and this motion for a preliminary injunction. ACU calls this time lapse a "delay," and contends that it precludes a showing of irreparable harm. Indeed, "[d]elay alone may justify the denial of a preliminary injunction when the delay is inexplainable in light of a plaintiff's knowledge of the conduct of the defendant." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 894 (8th Cir. 2013). The record demonstrates that Long became aware of the opening of the first Modern Acupuncture clinic in Colorado in 2018. (2d Long Decl. ¶ 16.) Modern Point brought this action in March 2019 and filed this motion for preliminary injunction in June 2020.

The time lapse is explainable, to be sure. First and foremost, it is explained by Long's cancer and extensive treatments. Long attests that she became aware of the first Modern Acupuncture clinic opening in Colorado in 2018 while she was being treated for her first bout of cancer, which impacted her ability to respond. (2d Long Decl. ¶¶ 16, 17.) By early 2019, the Modern Acupuncture clinic in Minnesota had opened, and Long finally had the capacity to respond. (*Id.* ¶ 18.) Modern Point submitted a cease and desist letter to ACU in January 2019 and filed this lawsuit in April 2019 after Modern Point's counsel had brief discussions with ACU. (*Id.*; Compl. ¶ 44; Ans. ¶ 44); *see Guess?, Inc. v. Tres Hermanos*, 993 F. Supp. 1277, 1286 (C.D. Cal. 1997) ("The nine month delay from the cease-and-desist letter to the filing of suit is a reasonable time for Plaintiff to have allowed Defendants to respond to its request and pursue settlement avenues."). By August 2019, Long learned her cancer recurred, and the parties stipulated to a stay during Long's surgeries and treatment. (2d Long Decl. ¶ 19; Long Dep. at 62.) The stay remained in place until April 2020. (ECF No. 30.) ACU does not dispute the cancer treatment explanation, but it maintains that it does not explain the entire delay. (ECF No. 69 at 15.)

The next period—between April and September 2019—is explained by ACU's decision to file the Colorado action against Modern Point soon after the initiation of this action. While ACU is correct in asserting that the Colorado action did not preclude Modern Point from filing this motion, Long credibly attests that Modern Point has limited funds and could not afford to litigate in both jurisdictions simultaneously. (Long Decl.

¶ 10); *see Elec. Commc'ns, Inc. v. Elec. Components for Indus. Co.*, 443 F.2d 487, 490 (8th Cir. 1971) (finding plaintiff had a valid reason for delaying institution of an action for five years where it "was engaged in litigation on the same subject against another company for the purpose of protecting its trademark" and the action was commenced shortly after termination of the other litigation).

Next, after the stay due to Long's cancer treatments was lifted in April 2020, the parties stayed the case while engaging in settlement negotiations in May 2020. Because there is no indication that the parties were negotiating in anything but good faith, the Court will not penalize Modern Point for this delay. *See Ocean Garden, Inc. v. Marktrade Co.*, 953 F.2d 500, 508 (9th Cir. 1991) (holding six-month delay from the filing of the complaint to the motion for preliminary injunction did not bar relief where non-movant was "unable to demonstrate that any harm resulted from the delay because much of the delay during this period was due to extensions requested by [nonmovant and] these extensions were granted to allow for settlement negotiations"). When the settlement negotiations were unsuccessful, the parties stipulated to an approximately one-month stay of case due to COVID-19-based health and business concerns. That stay lifted on June 22. (Long Decl. ¶ 12.) Modern Point filed its motion for preliminary injunction four days later, on June 26.

The gap between initiating this action and moving for injunctive relief is unusual, but Modern Point's reasons satisfy the Court that the delay does not justify denial of preliminary injunction.

### IV.        Balancing of the Harms

In balancing the equities, the Court is to weigh "the threat of irreparable harm" shown by the movant against "the injury that granting the injunction will inflict on other parties litigant." *Dataphase*, 640 F.2d at 113. As discussed above, Modern Point has shown a threat of irreparable harm. The Court balances this harm against the injury inflicted on ACU and its franchisees by the injunction. Modern Point maintains that because it only seeks an injunction precluding the use of the MODERN ACUPUNCTURE mark in Colorado and Minnesota, ACU and its franchisees are not prevented from doing business in those states or using the marks elsewhere. *See, e.g., Novus Franchising, Inc. v. AZ Glassworks, LLC*, No. 12-CV-1771 (MJD/TNL), 2012 WL 5057095, at *9 (D. Minn. Sept. 27, 2012), *R&R adopted*, 2012 WL 5072363 (D. Minn. Oct. 18, 2012) ("[Non-movant] may continue to operate its auto glass repair and replacement business, it just . . . must cease using [movant's] Names and Marks"). Modern Point also notes that because the acupuncture services are down due to the COVID-19 pandemic, ACU and its franchisees should have time and resources to make these changes and alert clients.

The Court acknowledges ACU's argument, which focuses on the significant investment of time and money in its Colorado and Minnesota clinics, its unified brand,

and its relationship with its franchisees. (*See* St. Clair Decl. ¶¶ 12–13 (attesting that ACU spent $50,000 on developing its mark, $25,000 on licensing the mark, and $295,000 on creating advertising in Minnesota and Colorado in 2018 and 2019, and that the franchisees have invested approximately $2 million developing their business).) But the Eighth Circuit has cautioned that a plaintiff's "vested and existing rights cannot be overpowered merely by defendants' comparatively massive size and generous promotional expenditures. . . . The defendant may not justify its use of the plaintiff's trademark upon the ground that the plaintiff's volume of business was comparatively small." *Sweetarts*, 380 F.2d at 928 (citations omitted). And while an injunction may well impact ACU's national branding strategy, ACU apparently anticipated this possibility, as its Franchise Agreements specifically provide that ACU has sole discretion to modify or discontinue the use of the franchise mark.[8] (ECF No. 110 ¶ 22 & Exs. 1–4 (Modern Acupuncture Franchise Agreements) § 7.4 (under seal).)

---

[8] The Franchise Agreements provide that if ACU decides to modify or discontinue the use of any mark, the franchisees agree to comply with ACU's directions to modify or otherwise discontinue the use of the mark, or use one or more additional or substitute trade or service marks, within a reasonable time after receiving such notice. (ECF No. 110 ¶ 22 & Exs. 1–4 (Modern Acupuncture Franchise Agreements) § 7.4 (under seal).) Given ACU's unilateral control of the franchisees' use of its marks, the Court considers the franchisees to be "in active concert or participation with" ACU, and thus bound by the injunction under Rule 65(d)(2)(C). *See Dawson*, 725 F.3d at 892 (noting that an injunction would include a nonparty under Fed. R. Civ. P. 65(d)(2)(C) if the defendant caused the nonparty to use the plaintiff's marks in violation of the injunction).

Based on the evidence before the Court, Modern Point has demonstrated that the harm to it caused by consumer confusion in the marketplace is likely to be irreparable, and that a preliminary injunction at this juncture would cause less harm to ACU and its franchisees, given the reduced use of acupuncture services during the current COVID-19 pandemic. Therefore, the balance of harms weighs in favor of granting an injunction.

## V.   Public Interest

The public interest is promoted by "preventing customer confusion and infringement of trademarks." *Buffalo Wild Wings Int'l, Inc. v. Grand Canyon Equity Partners, LLC*, 829 F. Supp. 2d 836, 847 (D. Minn. 2011) (citation omitted). "[W]here the likelihood of success on the claim is not overwhelming, the weight of the public interest factor is correspondingly reduced." *Plasti Dip Int'l Inc. v. Rust-Oleum Brands Co.*, No. 14-CV-1831 (JRT/SER), 2014 WL 7183789, at *8 (D. Minn. Dec. 16, 2014). The Court has found that Modern Point is likely to succeed on the merits of its claims against ACU. As such, the public interest is promoted by preventing consumer confusion and trademark infringement.

## VI.   Bond

Rule 65(c) of the Federal Rules of Civil Procedure provides that the court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). While the Eighth Circuit

allows a district court much discretion in setting bond, it will reverse the court's order if it "abuses that discretion due to some improper purpose, or otherwise fails to require an adequate bond or to make the necessary findings in support of its determinations." *Hill v. Xyquad, Inc.*, 939 F.2d 627, 632 (8th Cir. 1991). "Courts in this circuit have almost always required a bond before issuing a preliminary injunction . . . but exceptions have been made . . . where the damages resulting from a wrongful issuance of an injunction have not been shown." *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016) (citations omitted).

Modern Point requests that the Court waive the bond requirement of Rule 65(c) because injunctive relief poses little potential harm to ACU or its franchisees. It maintains that the franchisees can mitigate any harm during their idle time resulting from reduced acupuncture operations during the COVID-19 pandemic. ACU requests a bond of $932,000 based on costs and damages sustained by ACU and its franchisees, including lost profits and revenue, rebranding, signage, and corrective advertising. (St. Clair Decl. ¶ 18.) In its supplemental brief, ACU warns that the cost of further disruption to business due to an injunction would likely force permanent closures to the franchisees' clinics because they are already suffering financially due to the negative impact of the COVID-19 pandemic on their businesses.[9] (2d St. Clair Decl. ¶¶ 2–4.) None of ACU's clinics in

---

[9] In ACU's supplemental brief, it revised its requested bond amount to $3.5 million, claiming that the injunction combined with the impact of the COVID-19 pandemic may

Minnesota and Colorado has made a profit, and at least one appears to be closing permanently, regardless of this Court's ruling. (*Id*. ¶ 3); Modern Acupuncture, Westwind Plaza Minnetonka (Will Permanently Close 10/24/2020), https://www.modernacupuncture.com/minnesota/minnetonka/westwind-plaza-minnetonka-mn001. At the hearing, ACU's counsel claimed that the franchisees would be forced to close while they changed the signage, causing them financial harm. ACU provides no link in the logic between a change of signage and the closing of a business. The injunction does not prevent any franchise from remaining open and operating; it merely addresses the use of the MODERN ACUPUNCTURE mark. The Court concludes that the amount of $100,000 is proper to support costs and damages sustained by any party found to have been wrongfully enjoined or restrained. (*See* St. Clair Decl. ¶ 18 (attesting to the "amount of approximately $100,000 solely for signage and corrective advertising").) Accordingly, the Court orders a bond of $100,000.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, the motion for preliminary injunction (ECF No. 43) is GRANTED. Accordingly, IT IS HEREBY ORDERED THAT ACU, its officers, agents, employees, representatives,

---

force the clinics in Colorado and Minnesota to close. (ECF No. 103 at 10.) The Court finds this new amount to be less than credible, given the dearth of evidence supporting the calculation.

attorneys and all others in active concert or participation with ACU, including ACU's franchisees and licensees in Minnesota and Colorado, are immediately:

1. Restrained from doing business under the name MODERN ACUPUNCTURE in Minnesota and Colorado;

2. Ordered to remove from public view all advertising and uses in commerce within their control in the territorial boundaries of Minnesota and Colorado that refer to MODERN ACUPUNCTURE;

3. Ordered to remove from public view all content on websites referring to the clinics within Minnesota and Colorado as MODERN ACUPUNCTURE clinics; and

4. Restrained from using in Minnesota or Colorado commerce and advertising the mark MODERN ACUPUNCTURE or any confusingly similar designation alone or in combination with other words or designs, as a trademark, service mark, trade name component or to otherwise market, advertise, or identify acupuncture products or services not authorized by Modern Point.

5. This Order shall take effect immediately and shall remain in effect until further order of this Court.

6. Within ten (10) days of the date of this Order, Modern Point shall post a bond with the Clerk of this Court in the sum of $100,000 pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.

7. ACU shall provide prompt notice of this Order to all of its officers, agents, employees, representatives, attorneys and all others in active concert or participation with ACU, including ACU's franchisees and licensees in Minnesota and Colorado.

Dated: October 28, 2020                 BY THE COURT:

                                        s/Nancy E. Brasel
                                        Nancy E. Brasel
                                        United States District Judge